# EXHIBIT A

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

OLIVIA VAN HOUSEN, STEFAN        )
 4  REBIC, and NATE DIUZAK,       )
                                  )
 5              Plaintiffs,        )
                                  )
 6  -vs-                          )  Case No. 23 C 15634
                                  )
 7  AMAZON.COM, INC., and AMAZON  )
    WEB SERVICES, INC.,           )
 8                                )
                Defendants.       )
 9  _____)
    CARLEEN COULTER, individually )
10  and on behalf of all others   )
    similarly situated,           )
11                                )
                Plaintiffs,        )
12                                )
    -vs-                          )  Case No. 23 C 16176
13                                )
    HUDSON GROUP (HG) RETAIL, LLC,)
14  doing business as HUDSON      )
    NONSTOP, and DUFRY AMERICA,   )
15  LLC,                          )  Chicago, Illinois
                                  )  November 6, 2024
16              Defendants.       )  9:47 a.m.

17

18           TRANSCRIPT OF TELEPHONIC PROCEEDINGS
            BEFORE THE HONORABLE LaSHONDA A. HUNT

19  APPEARANCES:

20  For the Plaintiffs:    JUSTIN NICHOLAS BOLEY
                           WEXLER BOLEY & ELGERSMA, LLP
21                         311 South Wacker Drive, Suite 5450
                           Chicago, Illinois  60606

22

23  For the Defendants:    MR. MOEZ M. KABA
                           HUESTON HENNIGAN, LLP
24                         523 West 6th Street, Suite 400
                           Los Angeles, California  90014

25
```

1   APPEARANCES:   (Continued)

2   For the Defendants:     MS. KATHLEEN A. STETSKO
                            PERKINS COIE, LLP
3                           110 North Wacker Drive, Suite 3400
                            Chicago, Illinois  60606
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18
    Court Reporter:         CHARLES R. ZANDI, CSR, RPR, FCRR
19                          Official Court Reporter
                            219 S. Dearborn Street, Room 1426
20                          Chicago, Illinois  60604
                            Telephone:  (312) 435-5387
21                          charles_zandi@ilnd.uscourts.gov

22

23                              *   *   *   *   *

24
                        PROCEEDINGS REPORTED BY STENOTYPE
25          TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1       (Proceedings heard in open court:)

2           THE CLERK:  Okay.  I'm going to go ahead and call the

3  case.  23 Civil --

4           THE COURT:  All right.  Thank you.

5           THE CLERK:  -- 15634, Van Housen, et al., versus

6  Amazon.com, Inc., et al., and the related case, which is

7  23 Civil 16176, Coulter versus Hudson Group (HG) Retail, LLC,

8  et al.

9           And could we have appearances for the record, starting

10  with counsel for plaintiff.  Thank you.

11          MR. BOLEY:  Good morning, your Honor.  This is Justin

12  Boley from Wexler Boley & Elgersma on behalf of the plaintiffs

13  in both cases, and I'm appearing -- I'm the only one appearing

14  for plaintiffs today.

15          THE COURT:  All right.  Good morning.

16          MR. KABA:  Good morning, your Honor.  Moez Kaba of

17  Hueston Hennigan on behalf of the defendants in both cases.

18          THE COURT:  All right.

19          MS. STETSKO:  Good morning, your Honor.  Kathleen

20  Stetsko of Perkins Coie on behalf of the defendants in both

21  cases.

22          THE COURT:  All right.  Okay.  So, it sounds like we

23  have everyone.

24          All right.  I have reviewed the motions to dismiss

25  that have been filed in each of the cases.  I know that there

1    are some overlapping claims here, and so I'll start first with

2    the Van Housen case, and then some of my ruling will also apply

3    to the Coulter case; but then there are a couple of additional

4    arguments that have been raised in Coulter that I need to

5    address.

6         And then there's going to be one difference between

7    the two cases.  So, I'll tell you in advance that for the most

8    part, the motions to dismiss will be denied; but actually the

9    Coulter motion to dismiss will be granted in one small part,

10   so just so that you know where I'm going as you're listening

11   to this.

12        So, let me start with the Van Housen case and my

13   ruling there.  So, the plaintiffs allege that defendants

14   Amazon Go and Amazon Fresh Stores employ this proprietary Just

15   Walk Out or JWO technology, which consists of this complex

16   network of sensors, cameras, machine learning, and artificial

17   intelligence that work to automatically detect when products

18   are taken from store shelves and keep track of those items in

19   a virtual cart.  That's what the plaintiff alleges.

20        Plaintiffs further allege that the JWO technology

21   collects, uses, stores, and disseminates biometric identifiers,

22   including facial geometry, hand geometry, and voice prints.

23   Again, those are allegations in the complaint.

24        Plaintiffs contend that defendants' technology and

25   this biometric data collection are shown in its various patent

5

1    filings, including patent No. US 2015/0012396, which is

2    entitled, "Transition Items From a Materials-Handling

3    Facility."

4           So, the plaintiffs have brought claims under the

5    Illinois Biometric Information Privacy Act, or BIPA, for

6    failure to establish a publicly available policy, claim one;

7    to obtain biometric identifiers without written informed

8    consent, which is claim two; profiting from biometric

9    information, claim three; and disclosing biometric information,

10   which is claim four.

11          The defendants have moved to dismiss, essentially

12   arguing that the plaintiffs haven't plausibly alleged that they

13   collect biometric identifiers or alleged disclosure, as well as

14   whether there was actually a sale of this data.

15          In addition, in the Van Housen case, the plaintiffs --

16   after all the initial briefs were filed, the plaintiffs moved

17   for leave to file a surreply in opposition.

18          So, let me first start with the BIPA claim for

19   collection of biometric identifiers.  So that's claims -- sort

20   of combined.  So, for purposes of BIPA, a biometric identifier

21   is this retina or iris scan, fingerprint, voice point, or scan

22   of hand or face geometry, which is indicated in 740 ILCS 14/10.

23          So here, the plaintiffs contend that the defendants

24   are collecting their facial geometry, hand geometry, and voice

25   print, and in support of those allegations, they point to the

6

1    defendants' patents, including the '396 patent.

2           According to the complaint, the '396 patent provides

3    that, one, various techniques may be used to identify a user;

4    for example, this image capture and facial recognition may be

5    used; number two, image capture devices may be positioned

6    overhead to capture images of users; three, one or more images

7    may be captured of the user's hand prior to it passing into and

8    as it exits the inventory location; and then, four, microphones

9    may record sounds made by the user and the computing resources

10   may process those sounds to determine a location of the user.

11          Again, this is all alleged in the complaint.

12          The defendants argue that those patent filings do not

13   support plaintiffs' theories for a number of different reasons,

14   but I boil it down into sort of two main issues.  One, the

15   defendants don't believe that those patents show that they

16   are actually using the patented technology -- in the complaint,

17   I should say, it doesn't show that they're actually using the

18   patented technology; and two, there's a question about whether

19   the patented technology actually collects these biometric

20   identifiers.

21          So, there are two cases that I think are relevant

22   here.  *Delgado v. Meta Platforms, Inc.*, No. 23 CV 4181,

23   2024 Westlaw 818344, Northern District of California,

24   February 27th, 2024.  That was a case where the plaintiff

25   alleged that Meta collected her voice print without complying

1   with the requirements of BIPA, and in support of those claims,

2   she relied on -- the plaintiff relied on Meta's patent.  In

3   response, Meta argued that the plaintiff failed to show that

4   Meta actually practiced the patent.

5        And the court found that many of Meta's arguments,

6   including those related to whether Meta practiced the patents,

7   were more appropriate for consideration at a later stage of the

8   case.  Because, obviously, this is a Rule 12(b)(6) motion, and

9   I am looking only at the pleadings and whether they plausibly

10  allege a claim under the *Iqbal* and *Twombly* standards.  And so

11  that was how the district court in California looked at that

12  question about whether there was actually evidence of

13  practicing the patent.

14       The other case I focused on was *Carpenter v.*

15  *McDonald's Corp.,* 580 F.Supp. 3d 512, 517 to 518, Northern

16  District of Illinois 2022, where the plaintiff alleged that

17  McDonald's violated BIPA by using an artificial intelligence

18  voice assistant to collect customers' voice prints.  In

19  response, McDonald's argued that the plaintiff's allegation

20  that the technology identified the individual speaking or

21  extracted biometrics was belied by the defendant's patent.

22       And notwithstanding those arguments, the court found

23  that based on the facts pleaded in the complaint, including

24  the referenced patent, it was reasonable to infer, though far

25  from proven, that defendant's technology mechanically analyzes

1    customers' voices in a measurable way such that McDonald's has

2    collected a voice print from plaintiff and other customers.

3    Discovery may show that defendant's technology cannot or does

4    not collect any vocal information that could be used to

5    uniquely identify an individual, in which case summary judgment

6    may be appropriate; but plaintiff has alleged sufficient

7    factual information to make a plausible claim at this early

8    stage.

9          So, here in this case, the '396 patent indicates that

10   the technology, one, may be used in retail stores; two, can

11   collect biometrics; and, three, functions to provide an

12   experience that is like the experience of visiting one of

13   defendants' stores.

14         And so at this stage of the case, again, as I already

15   indicated, a claim for relief must be plausible, rather than

16   merely conceivable or speculative.  But all this means is that

17   the plaintiff must include enough details about the subject

18   matter of the case to present a story that holds together.

19         At this pleading stage, we do not ask whether these

20   things actually happened.  Instead, the proper question to ask

21   is still:  Could these things have happened?  That is *Runnion*

22   *ex rel. Runnion* v. *Girl Scouts of Greater Chicago and Northwest*

23   *Indiana*, 786 F.3d 510, 526, Seventh Circuit 2015.

24         And I -- like the plaintiffs in *Delgado* and the

25   *Carpenter* cases, the court agrees that the plaintiff has

1  plausibly alleged that the defendant practiced the patent in

2  its stores and that the JWO technology captures those biometric

3  identifiers.

4        The second issue that I'll turn to is the question of

5  disclosure.  So, "disclose" means to make known or to reveal

6  something that is secret or not generally known.  That's from

7  the *Cothron* case, *Cothron* v. *White Castle Systems, Inc.*,

8  216 N.E. 3d 918, 925, Illinois 2023, as modified on the denial

9  of rehearing, July 18, 2023, examining the plain meaning of

10  "disclosed."

11        So here in this case, the plaintiffs allege that

12  defendants disclose and re-disclose the biometric data of

13  shoppers from cameras, computers, and servers in the JWO store

14  itself through the Internet and to computers and servers

15  external to the store like servers at AWS and Amazon or other

16  third-party cloud platforms whose employees may also have

17  access to data.  And that's in the complaint at paragraph 43.

18        So, the defendants argue here that the plaintiffs'

19  allegations that the defendants use their own servers and

20  services to host data doesn't constitute a violation of

21  Section 15(d).  In addition, defendants argue that the

22  plaintiffs' reliance on the patent to demonstrate that Amazon

23  could disclose information to third parties is insufficient to

24  make plaintiffs' claims plausible.

25        The court disagrees, as plaintiffs' allegation that

1    defendants are disclosing these biometric identifiers to

2    third-party cloud platforms is sufficient to state a claim

3    under Section 15(d).  See *Figueroa v. Kronos*, *Inc.*,

4    454 F.Supp. 3d 772, 785, Northern District of Illinois, 2020.

5    In that case, the court commented that the complaint alleges

6    that Kronos disseminated plaintiffs' biometric data to other

7    firms that hosted the information in their data centers.  That

8    is a textbook violation of Section 15(d).

9        Additional cite, *Heard v. Becton Dickinson & Company*,

10   524 F.Supp. 3d 831, 843, Northern District of Illinois 2021,

11   finding that plaintiff's allegation that defendant disseminated

12   biometric data to unknown third-party data centers was quite

13   thin, but nonetheless sufficient to state a claim under

14   Section 15(d).

15       And then with respect to BIPA claim -- there's a BIPA

16   claim under Section 15(c).  Section 15(c) of BIPA states that

17   no private entity in possession of a biometric identifier or

18   biometric information may sell, lease, trade, or otherwise

19   profit from a customer's biometric data.  The defendants raise

20   this claim in the opening brief.  The plaintiff responded, and

21   the defendant did not address the plaintiffs' response in the

22   reply brief.  And so I don't know if that was meant to indicate

23   that the defendant was no longer contesting that point, but

24   even assuming the defendant is not, the Court finds that

25   because the plaintiff -- the plaintiff here alleged that the

1    data was used in AI, in machine-learning algorithms to not only

2    improve this technology, but to also sell it to other

3    retailers, then that allegation is sufficient under the

4    *Thornley* holding in the Seventh Circuit case?  *Thornley v.*

5    *Clearview AI, Inc.*, 984 F.3d 1241, Seventh Circuit 2021, to

6    state a claim under Section 15(c).

7           With respect -- so, that is the motion to dismiss in

8    the Van Housen case, and that motion to -- defendants' motion

9    to dismiss, for all of those reasons, will be denied.

10          With respect to the plaintiffs' surreply, move for

11   leave to file one arguing that the defendants raised new

12   arguments in the reply brief regarding correspondence that was

13   sent to plaintiffs' counsel and the defendants opposed that

14   request to file a surreply, the Court did not rely on those

15   pre-litigation communications between defendants' and

16   plaintiffs' counsel in ruling on the motion to dismiss; and,

17   therefore, there's really no need to even consider whether a

18   surreply should or should not be filed.  And so that motion

19   will be denied as unnecessary.

20          All right.  So, that is the Van Housen ruling.  With

21   respect to the Coulter case, much of what I would have to say

22   is pretty much the same.

23          So, in the Coulter case, the facts alleged there are

24   very similar to the facts alleged in the related case.

25   Specifically, the plaintiffs there allege that the defendant,

1    Hudson Nonstop store employs Amazon's proprietary Just Walk Out

2    data technology, which as I've already explained, consists of

3    this network of sensors and cameras and other information that

4    works to automatically detect when products are taken off their

5    store shelves and basically tracks them in a virtual cart.  So

6    that -- those are the allegations in the complaint.

7         Again, as with the Van Housen case, the plaintiffs

8    here allege that the JWO technology and its biometric data

9    collection are shown in Amazon's various patent filings,

10    including the '396 patent.

11         So similar or very same claims are brought in this

12    case as in the other case, and the same sort of issues arise

13    there with respect to number one, whether the patent has been

14    practiced and whether the -- whether the defendants are

15    actually using that patented technology and whether the

16    patented technology collects those biometric identifiers.

17         And so for all of the reasons that I have stated in

18    connection with the Van Housen case, I find that, again, the

19    plaintiffs in the case have plausibly alleged that the

20    defendants are practicing the patent in the store and that the

21    JWO technology is capturing those biometric identifiers.  And

22    then second, I find that the allegations sufficiently allege

23    that there has been -- there is disclosure of that information

24    as well.

25         Where I vary slightly in the Coulter case is with

1    respect to BIPA Section 15(c) because in that case, this is a

2    situation where it's essentially a retailer who is using the

3    technology, and the argument is that because the retailer --

4    because the defendant is profiting from the sale due to the

5    minimal labor cost, that that is the basis for a 15(c) claim.

6    And I don't think that that is actually sufficient based on the

7    Seventh Circuit's ruling in *Thornley*, which -- and I'll cite to

8    actually a district court case that describes that holding,

9    *Halim v. Charlotte Tilbury Beauty, Inc.*, No. 23 CV 94.  It's

10   2023 Westlaw 3388898, May 11th, 2023.

11          In that case, the district court explained the holding

12   in *Thornley* as follows:

13          "The Appellate Court explained that Section 15(c)

14   creates a, 'general rule that prohibits the operation of a

15   market in biometric identifiers and information.'  Without

16   any 'allegations of concrete and particularized harm to the

17   plaintiff,' a claim that defendant violated Section 15(c) is

18   insufficient to establish Article III standing.

19          "It noted that a plaintiff might have a Section 15(c)

20   claim if, for example, the plaintiff asserted that by selling

21   her data, the collector has deprived her of the opportunity to

22   profit from her biometric information; that the act of selling

23   her data amplified the invasion of her privacy that occurred

24   when the data was first collected, by disseminating it to some

25   unspecified number of other people; or that the scraping of

1    data from social media sites raised the costs of using these

2    sites in some respect."  And that's *Halim* at page 9.

3          None of that has been alleged here in the complaint

4    that has been filed against the defendant retail store.  And

5    merely alleging that somehow the sales alone are -- the fact

6    that there are sales being made is enough to satisfy

7    Section 15(c) I don't think comports with the *Thornley* case.

8    And so I do believe that that claim cannot stand.

9          And since the case was actually removed here, I think

10   that one claim would actually be remanded, although we can talk

11   about that in a second, what you want to do with the 15(c)

12   claim.

13         Let me go to the final claim in the Coulter case,

14   which is different from the Van Housen case.  There is an

15   additional argument that the defendants make about the

16   government contractor exception.

17         So, the requirements of BIPA only apply to private

18   entities.  That's *Enriquez v. Navy Pier, Inc.*, 2022 IL

19   App. (1st) 211414-U, paragraph 19, appeal denied, 201 N.E. 3d

20   582, Illinois 2023, citing 740 ILCS 14/15.

21         Specifically, Section 25(e) provides that the act does

22   not apply to a contractor, subcontractor, or agent of a state

23   agency or local unit of government when working for that state

24   agency or local unit of government.  And again, the *Enriquez*

25   case indicates that.

1    "Thus, an entity is exempt under Section 25(e) if it

2    is, one, a contractor, two, of a unit of government and working

3    for that unit of government at the time it collected or

4    disseminated biometric information."

5        So here, the defendants contend that judicially

6    noticeable documents show that the defendants operate their

7    store pursuant to city government contracts; and, therefore,

8    they are exempt from BIPA.  Plaintiffs, however, argue that

9    defendants are retail tenants that were not working for the

10   government when they collected biometric data.  The Court

11   agrees with the plaintiff.

12       In *Enriquez*, the plaintiff alleged that the defendant

13   violated BIPA by collecting and disseminating her fingerprint.

14   The defendant moved to dismiss arguing that it was subject to

15   the government contractor exception -- exemption, I'm sorry.

16   In response, plaintiff argued that defendant was a lessee of

17   the government entity, not a government contractor.  The court

18   disagreed, finding that although the agreement bears some

19   characteristics of a net lease, the underlying substance of the

20   agreement is for defendant to manage, operate, and develop

21   virtually all aspects of Navy Pier on behalf of the government

22   entity.

23       Additionally, the court found that the defendant there

24   was working for the government entity when it collected the

25   plaintiff's biometric information as the defendant was in an

1 employment or services relationship with the government entity.

2 So here, in support of their position, the

3 defendants point to press releases issued by the City of

4 Chicago and the retail license agreement between defendants and

5 the City of Chicago. And the plaintiffs do not object to

6 defendants' reliance on these documents, even though they are

7 documents that are outside of the four corners of the

8 complaint.

9 So, the May 2017 press release references an agreement

10 between the Midway Partnership and the City of Chicago, where

11 Midway Partnership agreed to invest 75 million to renovate and

12 expand concessions at Midway. That referenced agreement,

13 though, has not been provided to the Court.

14 The retail license agreement provides defendants a

15 license to conduct concession operations in a retail space and

16 operate and maintain storage space. Additionally, the

17 agreement provides that nothing in the agreement is intended to

18 create any relationship other than that of licensor and

19 licensee or any partnership, joint venture, association, or

20 organization of any kind between the city and licensee.

21 So, at this stage of the litigation, based on those

22 documents, the Court will not conclude that defendants plainly

23 fall under the Section 25(e) exemption. *Flores v. Motorola*

24 *Solutions, Inc.*, No. 20 C 1128, 2021 Westlaw 232627 at 2,

25 Northern District of Illinois, January 8th, 2021.

1    The defendants' agreement to renovate and expand

2  concessions, which was described in the May 2017 press release,

3  arguably created a services relationship between the defendant

4  and the City of Chicago.  However, the Court is not yet

5  convinced that the defendants were working for the government

6  when they were operating the Hudson Nonstop store.  We need

7  definitely more of a record developed on that before the Court

8  can make that determination.

9    And notably, the retail license agreement in this case

10  is much more limited than the agreement in *Enriquez*, where the

11  defendant actually agreed that it was managing and operating

12  virtually all aspects of Navy Pier on behalf of the government

13  entity.

14    So, that claim can go forward, although defendants can

15  certainly raise that statutory exemption argument at later

16  stages of the litigation.

17    All right.  So, sometimes these oral rulings are very,

18  very painful to do.  It's painful for me to read.  It's

19  probably painful for you to listen it.  But that's often a more

20  effective way to just move the case forward.

21    So, I think the first question that I will ask is in

22  both cases, since the motions to dismiss basically for the most

23  part have been denied, when would the defendants like to file

24  their answer to the complaint?

25    MR. KABA:  Your Honor, it's Moez Kaba on behalf of the

1  defendants.  In light of the intervening holiday, we would

2  normally say 21 days, but would it be okay with the Court if we

3  had 30 days and we filed by December 6th?

4       THE COURT:  Sure.  So, that answer -- those answers

5  are due by December 6.  And then I will set a date for the

6  parties to submit a discovery plan.  Normally I just do about

7  14 days after the answer is due, but that would take you to

8  December 20th, which is right before the holidays, or we can go

9  to after the holidays.

10       MS. STETSKO:  There's really nothing more than --

11       THE COURT:  Yep.

12       MR. BOLEY:  Sorry.  This is Justin Boley for the

13  plaintiff, and I was going to say that the earlier date works

14  just fine for us if it works for defendants.  December 20th

15  would be fine for a discovery plan on our side.

16       MR. KABA:  Yes, your Honor, we'll -- we'll make

17  December 20th work as well.

18       THE COURT:  Okay.  So then, December 6th for answers,

19  and December 20th for a joint proposed discovery plan.

20       All right.  So then, with respect to the Coulter case,

21  because I granted the motion -- I'm sorry, denied the motion to

22  dismiss for the most part, but granted as to that one claim,

23  how do the parties want to proceed with that?

24       Because technically, I think I should remand it, but

25  I don't know if you want me to do that.  I don't have to do

1    anything today.  I mean, it can just stay in the complaint and

2    be identified as the Court dismissed this claim if that's how

3    you want to proceed, but I at least wanted to check and ask

4    your opinion.

5         MR. BOLEY:  Thank you.  Your Honor, this is Justin

6    Boley for plaintiff again.  I think our position would be that

7    given what I understand to be the Court's ruling in dismissing

8    the Coulter 15(c) claim, which is essentially Article III, lack

9    of Article III standing, and the procedural stance, given that

10   we filed in state court, that the correct next step from the

11   dismissal is, as your Honor identified, to remand that claim to

12   state court.  I think that's the right thing to do, given the

13   nature of the ruling.

14        THE COURT:  All right.  Then I will remand that to --

15   that one claim to state court, and the rest of this will

16   proceed.

17        So, do you want the same deadlines in the Coulter case

18   as well, keep those on the same track?

19        MR. BOLEY:  Yes, your Honor.  This is again Justin for

20   plaintiff.  And I might suggest that for now, we keep it that

21   way, the same track; and that if it's okay with the Court, on

22   our -- the deadline for our discovery plan submission,

23   December 20th, it may be after we discuss this with defendants

24   that there may be some other kind of housekeeping issues

25   related to consolidation and docket management that we could do

1    to make it easier for the Court, instead of having two dockets

2    running parallel, that we consolidate in some way just for ease

3    of future filings and things like that.

4         I don't know if that's something the Court will want

5    from us or even the defendants will entertain, but there may

6    be some things that we can submit on December 20th to further

7    streamline the coordinated consolidated -- the coordinated

8    cases, sorry, they're not consolidated, but coordinated cases,

9    to make it easier in the future, if that might be helpful to

10   the Court.

11        THE COURT:  Right.  I think that probably would be

12   helpful, and why don't you just tell me in your proposed

13   discovery plan.  You can treat it like you would treat a status

14   report, but you can tell me in your discovery plan.  I always

15   ask if there's anything else that the Court should know.

16        And so just include the information there if you have

17   a proposal.  If you want these two cases consolidated just for

18   pretrial proceedings, consolidated for trial, whatever you

19   think, tell me that, and then we can enter an appropriate

20   order.  Because I think it might make sense to consolidate for

21   pretrial proceedings.  It might not make as much sense for if

22   it goes to trial.

23        MR. BOLEY:  That sounds great.  Thank you, your Honor.

24        MR. KABA:  And, your Honor, we'd like -- sorry, your

25   Honor.  It's Moez Kaba.

1    THE COURT:  Okay.

2    MR. KABA:  We -- I appreciate the consolidation

3  request, or at least coordination request, and we appreciate

4  that the Court will give us an opportunity to sort of reflect

5  on it a bit as well; and we'll state our positions, if there

6  are contrary positions, in our discovery plan.

7    THE COURT:  Yep.  And just tell me if you object.

8    MR. KABA:  Yeah.  Thank you.  I also think -- I

9  understand the Court -- we have sort of this interesting issue

10  of whether 15(c) needs to be remanded if the Court's ruling was

11  based on a sort of lack of plausibility of the claim as

12  alleged, and then we have this question of what happens next

13  with our case.

14    And so I understand plaintiffs' view is that it ought

15  to be remanded.  If the Court would give us just a little bit

16  of time to reflect on that as well and submit our views to the

17  Court on the appropriate next step, I think we would appreciate

18  that.

19    THE COURT:  Right.  I mean, you certainly can.  I

20  don't have a problem with it.  But it's essentially -- the

21  *Thornley* case addresses it as a lack of standing.  And so I

22  don't -- you know, I know that it was raised in the context of

23  you haven't stated a claim, but really, the Seventh Circuit

24  says this is about Article III standing.

25    And so I don't really know that there is much

1   flexibility here, but I'll certainly wait until I get those --

2   let's just call it instead of a discovery plan, a joint status

3   report that will include a discovery plan, you know, thoughts

4   on next steps, and then any other matters that the parties want

5   to bring to the Court's attention.

6           MR. KABA:  Appreciate that.  Thank you, your Honor.

7   We'll coordinate with plaintiffs to get that submitted on

8   December 20th in both cases.

9           THE COURT:  Okay.  All right.  Thank you, everyone,

10  for your patience here.

11          MR. KABA:  Thank you.

12          MR. BOLEY:  Thank you, your Honor.

13          THE COURT:  All right.

14     (Proceedings concluded at 10:19 a.m.)

15

16              *   *   *   *   *

17          I certify that the foregoing is a correct transcript, to
    the extent possible, of the record of proceedings in the
18  above-entitled matter given the limitations of conducting
    proceedings via telephone.

19
    */s/ CHARLES R. ZANDI*                    *February 27, 2025*
20  CHARLES R. ZANDI, CSR, RPR, FCRR
    Official Court Reporter
21

22

23

24

25